AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/7/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ LM _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**APR 7 2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DTS _____ DEPUTY

United States of America,

v.

Maurice Landon Williamson II,

Defendant.

Case No.

## 5:21-mj-00257

**NOTE CHANGES BY COURT**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 6, 2021 in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/ pursuant to Fed. R. Crim. P. 4.1_____
*Complainant's signature*

ATF Special Agent Paul Kirwan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     _____4/7/2021_____

*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (x6246) /s/

## AFFIDAVIT

I, Paul Kirwan, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Maurice Landon WILLIAMSON II for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since May 2017.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I am an ATF Interstate Nexus Expert and routinely examine firearms and ammunition to determine their origins and travel in interstate commerce.  During my time as an ATF SA, I have testified as an expert witness in federal court, participated on multiple different task forces, and assisted in multiple narcotics and firearms investigations.  Based on my training and experience, and on my conversations with other ATF SAs, I am

familiar with the investigation of federal firearms and drug crimes, and with the ways in which people who commit those crimes use their residences, vehicles, and digital devices to facilitate and conceal their activity.  I have experience in processing and analyzing both computer and cell phone data as the result of executing multiple search warrants on digital devices.  I have experience in handling and utilizing confidential informants for information as well as planning controlled purchases for firearms and narcotics.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

4.    Based on my personal observations, my review of law enforcement reports and other documents, and conversations with other law enforcement agents, I believe the following to be true:

**A.    ATF Las Vegas Obtains Federal Search Warrants for WILLIAMSON II's Residence, Person, and Vehicle**

a.    On April 2, 2021, the Honorable Sheri Pym, United States Magistrate Judge for the Central District of California, signed search warrants authorizing the search of 807 West Blaine Street, Apartment #215, Riverside, California (a residence where WILLIAMSON II was primarily living), WILLIAMSON II's vehicle, and his person for evidence pertaining to federal firearms violations in case numbers ED MJ 21-233, 21-234, and 21-236.[1]  I have attached one of those search warrants and the supporting

---

[1] ATF also sought a search warrant for another vehicle associated with WILLIAMSON II in case number ED MJ 21-235, but Magistrate Judge Pym declined to sign that warrant.

affidavit of ATF SA Brandon May as Exhibit 1, and I incorporate
them here by reference.

   **B.   ATF Executes the Search Warrants and Finds Evidence of
          Gun Trafficking and a Loaded Gun in WILLIAMSON II's
          Pocket**

          b.   On April 6, 2021, other ATF agents, officers from
the West Post-Release Accountability and Compliance Team
("PACT"), and I set up surveillance at WILLIAMSON II's residence
to execute the search warrants.  At approximately 4:30 p.m.,
PACT officers in an unmarked surveillance vehicle saw WILLIAMSON
II, along with his girlfriend, J.T., walk out of the apartment
complex toward their vehicles.  At that time, PACT officers
exited their vehicle and detained WILLIAMSON II pursuant to the
warrant to search his person.  They searched him and recovered a
loaded Glock .357 magnum semi-automatic pistol, ~~bearing serial
number BPP0372~~, inside his pants pocket.  The firearm had a
round chambered and was loaded with approximately 10 rounds of
.357 magnum ammunition.  WILLIAMSON II was handcuffed and placed
in a police vehicle pending further investigation.

          c.   In addition to the loaded handgun, WILLIAMSON II
had on his person a Samsung cellular phone with a grey back.
The cell phone was seized as evidence and taken into custody by
ATF SA May.

          d.   With WILLIAMSON II detained, ATF agents and PACT
officers worked with J.T. to safely remove three young children
from the house before searching the residence.  Once inside the
residence, officers searched WILLIAMSON II's bedroom.  Inside
the bedroom, officers found packaging/mail with WILLIAMSON II's

3

name on it.  Next to that packaging and under the bed, Officers found an empty Ruger gun box and a Glock gun box.  Inside the Glock gun box was a magazine loaded with ammunition.  Officers also found some additional ammunition throughout the bedroom. Finally, they found a blue bandana in the bedroom, which is apparel usually worn by individuals associated with Crips criminal street gangs.

　　　　e.  A search of WILLIAMSON II's vehicle resulted in no additional evidence.  J.T. signed consent forms allowing ATF agents and Officers to search her BMW as well as her Mercedes Benz (the vehicle for which ATF originally applied for a search warrant in ED MJ 21-235).  Inside the Mercedes's trunk, I found another empty gun box, a box of ammunition, a wrapped-up paper towel containing loose rounds of ammunition, another blue bandana, and a caricature drawing of WILLIAMSON II.

　　　　**C.   Interview of J.T.**

　　　　f.  ATF agents spoke with J.T.  She advised that she did not own any firearms or ammunition and she was not aware of any firearms or ammunition in the apartment or the vehicles. She also stated that WILLIAMSON II was very private about what he does out on the street and that she was not aware of any criminal activity that he may be involved in.

　　　　**D.   Interview of WILLIAMSON II**

　　　　g.  Once finished at the scene, WILLIAMSON II was transported to the Riverside Police Department Orange Station where SA May and I interviewed him.  During the interview, SA May read WILLIAMSON II his <u>Miranda</u> rights from an ATF document.

WILLIAMSON II indicated he understood his rights and agreed to speak with us.

       h.   During the interview, WILLIAMSON II admitted to possessing the firearm in his pocket, what he called a "Trey Five Seven" (referring to the firearm's caliber, .357 magnum). WILLIAMSON II said he acquired the firearm on the street. WILLIAMSON II also stated he could probably sell the firearm on the street for approximately $1,500. WILLIAMSON II stated that he has the firearm for self-defense because he had recently been shot in the knee. I asked WILLIAMSON II about his gang activity, and he stated he was trying to "chill," but he stayed armed because he did not want to get killed. I asked WILLIAMSON II about 1200 Blocc Crips' turf in Riverside, and he said that criminal street gang experienced particular problems with the Eastside Riva criminal street gang because their territories border each other.

     5.   Based on what was recovered from the search warrant, what was found on WILLIAMSON II's person, the interview, and my training and experience, I believe that WILLIAMSON II is an active gang member with the 1200 Blocc Crips who was armed both for protection and in furtherance of gang activity. Additionally, given the firearm found in his possession was not on file in the State of California and appeared to be brand new, the fact that there were additional gun boxes in WILLIAMSON II's bedroom and J.T.'s car, and the facts in SA May's attached affidavit showing text messages about straw purchasing firearms with an individual in Las Vegas, I believe that WILIAMSON II

finds straw purchasers out of state and transports guns to the State of California where they are sold on the street to other prohibited people who cannot purchase firearms lawfully at gun stores.

      **E.   Criminal History**

    6.   On April 6, 2021, I reviewed WILLIAMSON II's criminal history printout as well as unofficial online court records, and I learned that WILLIAMSON II has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

        a.   On or about June 2, 2017, a violation of PC 245(a)(2), assault with a firearm, with criminal street gang act enhancement, in the Superior Court for the State of California, County of Riverside, Case Number RIF1601285;

        b.   On or about April 7, 2014, a violation of PC 3056 Violation of Parole, in the Superior Court for the State of California, County of Riverside, Case Number RPR1400391; and

        c.   On or about November 26, 2012, a violation of PC 459, first degree burglary, and PC 186.22(a), criminal street gang act, in the Superior Court for the State of California, County of Riverside, Case Number RIF1202196.

      **F.   Interstate Nexus**

    7.   On April 6, 2021, I examined the handgun and, using my training and experience as an ATF interstate nexus expert, I determined that the handgun was manufactured outside of the State of California.

## IV. <u>CONCLUSION</u>

8.    For all the reasons described above, there is probable cause to believe that WILLIAMSON II has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

Attested to by the applicant, <u>ATF</u>
<u>SA Paul Kirwan</u>, in accordance with
the requirements of Fed. R. Crim.
P. 4.1 by telephone on this 7th
day of April 2021.

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| the person of Maurice WILLIAMSON II, born July 21, 1990 | ) ) ) ) ) ) |

FILED
CLERK, U.S. DISTRICT COURT

April 2, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: KC      DEPUTY

Case No.     5:21-MJ-00234

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 922(a)(6), 922(d)(1), 922(g)(1) | Conspiracy; False Statement During Firearm Acquisition; Disposing of a Firearm to a Felon; Felon in Possession of Firearms/Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Brandon May, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: __April 2, 2021_____

*Judge's signature*

City and state: Riverside, CA_____     Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Balla (951-276-6246) /s/

I, Brandon May, having been duly sworn, depose and state:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms, and Explosives ("ATF"), a component
of the United States Department of Justice, and have been so
employed since September of 2015.  I am currently assigned to
the ATF Las Vegas Group II Crime Gun Intelligence Task Force.
As an ATF SA, I have successfully completed the Criminal
Investigator Training Program and Special Agent Basic Training
at the Federal Law Enforcement Training Center in Glynco,
Georgia, and have conducted and participated in both state and
federal investigations including, but not limited to, the
trafficking of firearms and the illegal possession of firearms.

2.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, my review
of official reports, and information obtained from various law
enforcement personnel and witnesses.  This affidavit is intended
to show merely that there is sufficient probable cause for the
requested complaint, arrest warrant, and search warrants, and it
does not purport to set forth all my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II.  PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of an application
for a warrant to search the following, further described in
Attachments A-1 through A-4:

a.   807 W. Blaine Street, Apartment #215, Riverside, California 92507, as further described in Attachment A-1, (the "SUBJECT PREMISES");

b.   the person of Maurice WILLIAMSON II, born July 21, 1990, as further described in Attachment A-2;

c.   a black 2006 Mercedes-Benz sedan bearing California license plate number 8CKX299 and vehicle identification number WDDDJ75X36A050106, as further described in Attachment A-3 (the "SUBJECT MERCEDES"); and

d.   a black 1998 Honda sedan bearing California license plate number 4CLC601 and vehicle identification number JHMEJ6676WS016127, as further described in Attachment A-4 (the "SUBJECT HONDA").

4.   The requested warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371, Conspiracy to Commit an Offense Against the United States; 18 U.S.C. § 922(a)(6), False Statement During Attempted Acquisition of a Firearm; 18 U.S.C. § 922 (d)(1), Disposing of a Firearm to a Convicted Felon; 18 U.S.C. § 922 (g)(1), Felon in Possession of Firearm(s) and/or Ammunition (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.   ATF Las Vegas received a tip from a gun store about Davieon ROWE acting as a straw purchaser.  Law enforcement surveilled ROWE as he picked up firearms from the gun store and

confronted him and Maurice WILLIAMSON SR., a convicted felon, picking up boxes of guns together.

6.    Agents executed federal search warrants on ROWE and WILLIAMSON SR.'s phones and discovered not only messages between ROWE and WILLIAMSON SR. about straw purchasing firearms, but messages between ROWE and WILLIAMSON II, also a convicted felon, about straw purchasing firearms.  WILLIAMSON II lives in Riverside, California, at the SUBJECT PREMISES and uses the SUBJECT HONDA and SUBJECT MERCEDES.

### IV.   STATEMENT OF PROBABLE CAUSE

### A.   An FFL Sends ATF Las Vegas a Tip About ROWE's Straw Purchasing

7.    On March 4, 2021, ATF Las Vegas was contacted by a federal firearm licensee ("FFL"), Fallout Firearms, in North Las Vegas, Nevada, regarding a suspicious firearm transaction. Fallout informed ATF that the business was in possession of over twenty firearms that were shipped to the FFL from GrabAGun (www.grabagun.com), an online firearm retailer, for the purposes of conducting a background check and transfer to a customer identified as Davieon ROWE.

a.    I know from training and experience that online firearm retailers offer a selection of firearms for purchase online.  Online firearm retailers such as GrabAGun offer customers the ability to purchase firearms online, which are then shipped to a local FFL.  The customer takes possession of the online purchased firearm at the local FFL after completing

an ATF Form 4473 as required by federal law and a background check.

8.    On March 5, 2021, agents received shipping receipts and email correspondence from Fallout for ROWE's firearm purchases.  According to the shipping receipts, approximately 25 firearms were shipped to Fallout between the dates of February 18, 2021 and March 2, 2021 from the online retailer GrabAGun for ROWE.

9.    On March 8, 2021, agents received billing receipts for ROWE's firearm purchases.  ROWE purchased more than $27,820.45 worth of firearms in less than 60 days.  The firearms were shipped to two FFLs in the Las Vegas area.  Further, the firearms purchased by ROWE arrived at the respective FFLs at various dates and times, which were then held pending an in-person transfer to ROWE.  Below are firearms purchased by ROWE and billing information between the dates of January 24, 2021 through March 6, 2021:

    a.    Billing Information listed on GrabAGun invoices from January 24, 2021 through March 6, 2021:

    Billing Information:

    Name: DAVIEON ROWE

    Address: XXXX Autzen Stadium Way, Las Vegas, NV 89115

    Phone: 702-XXX-9506

    Email: dayboy24@icloud.com

    Payment Method:

    MasterCard XXXX4992

     b.   Firearms Purchased by ROWE from GrabAGun between January 24, 2021 through March 6, 2021 totaling about $27,820.45:

<u>March 6, 2021</u>

Beretta APX Centurion Black 9mm, QTY of 1, Total of $419.99

CZ Scorpian EVO 3 S1 Pistol FDE, QTY of 1, Total of $1,099.99

FN FNX-45 Pistol, QTY of 1, Total of $1,349.00

Taurus G3 Pistol 9mm, QTY of 1, Total of $319.33

Ruger Pistol 5.7x28mm, QTY of 1, Total of $649.00

Sig Sauer P320 M18, QTY of 1, Total of $679.99

Shipping: $47.94

Tax: $378.46

TOTAL: $4,945.35

<u>March 5, 2021</u>

Ruger-57 Pistol 5.7x28mm, QTY of 1, Total of $649.99

Century Arms, TP9, QTY of 1, Total of $709.99

SCCY CPX-2, QTY of 1, Total of $359.99

Glock 19X Gen 5, QTY of 1, Total of $769.99

Sig Sauer, P320, M18, $1,499.99

Shipping: $39.95

Tax: $334.16

TOTAL: $4,364.06

March 2, 2021

Glock 19 Gen 3 9mm, QTY of 1, Total of $599.00

Glock 26 Gen 3 9mm, QTY of 1, Total of $649.99

Glock 19 Gen 3 9mm, QTY of 2, Total of $1,299.98

Glock 45, Gen 5 9mm,  QTY of 1, Total of $679.99

Glock 17, Gen 5, QTY of 1, Total of $699.99

Glock 43X Brown, QTY of 1, Total of $649.00


Shipping: $55.93

Tax: $383.49

TOTAL: $5,018.36


March 2, 2021

Century Arms Canik, QTY of 1, Total of $769.99

Smith and Wesson MP40, QTY of 1, Total of $569.99

Springfield Hellcat, QTY of 1, Total of $629.00

FN 5.7 Pistol, QTY of 2, Total of $2199.98

Glock 19 Gen 5, QTY of 1, Total of $719.00

Shipping: $47.94

Tax: $409.46

TOTAL: $5,346.35


March 1, 2021

FN 509 Tactical, QTY of 1, Total of $899.99

Glock 19 Gen 3 9mm, QTY of 1, Total of $599.00

Springfield Armory XD, QTY of 1, Total of $429.99

Glock 19 Gen 5 9mm, QTY of 1, Total of $699.99

Glock 19 Gen 3, QTY of 1, Total of $899.99

Shipping: $39.95

Tax: $295.54

TOTAL: $3,864.45

February 28, 2021

Taurus G3 9mm, QTY of 1, Total of $319.99

Taurus G3 Handgun 9mm, QTY of 1, $349.99

Taurus G3 Pistol Gray 9mm, QTY of 1, $329.99

SDS Imports PX-9 9mm, QTY of 1, $379.99

Shipping: $31.96

Tax: $115.57

TOTAL: $1,527.49

February 19, 2021

Taurus G2C 9mm, QTY of 2, Total of $639.98

Shipping: $15.98

Tax: $53.60

TOTAL: $709.56

February 18, 2021

SAR9 Pistol 9mm, QTY of 1, Total of $399.99

Taurus G2C 9mm Pistol, QTY of 1, Total $319.99

Taurus G3 Pistol 9mm, QTY of 1, Total $349.99

SDS Imports PX-9, Total of $379.00

Shipping: $31.96

Tax: $121.43

TOTAL: $1,603.35

January 24, 2021

SDS Imports PX-9, QTY of 1, Total of $399.99

Shipping: $7.99

Tax: $33.50

TOTAL: $441.48

10.   According to Fallout, ROWE completed two Form 4473s during each firearm purchase.   Form 4473 is a form promulgated by the ATF that is completed when a person purchases a firearm from an FFL.   Form 4473 requires the purchaser to show proof of name, address, date of birth, government-issued photo ID, background check transaction number, and a short affidavit stating that the purchaser is eligible to purchase firearms under federal law.   The first "Yes" or "No" question on a Form 4473 asks the purchaser "Are you the actual transferee/buyer of the firearm(s) listed on this form?"   This question is directly followed by a warning: "Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person.   If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you."   On the ATF

Form 4473s, specifically Section B, question #21(a), ROWE marked the "yes" box on the forms.

11.   According to the ATF Form 4473 that was certified by ROWE on January 28, 2021, ROWE purchased an SDS Tisas Zigana PX-9 semi-automatic pistol, bearing S/N 20BM16172, from the online retailer GrabAGun, which was later transferred by Fallout on January 28, 2021, to ROWE.

12.   Further, Fallout informed agents that on March 3, 2021, ROWE instructed employees to contact him by calling the phone number (702) XXX-9506 regarding the remaining firearm transaction.   According to Fallout, this occurred when ROWE completed a Form 4473 for the remaining firearms that were pending to be transferred, which he also purchased from GrabAGun.

13.   On March 9, 2021, Fallout contacted ROWE by calling the phone number (702) XXX-9506.   According to Fallout, ROWE was notified that the background check was completed and that he can complete the firearms transfer the following day.   According to Fallout, ROWE agreed to an appointment during the afternoon hours the following day, March 10, 2021.

**B.   Law Enforcement Conducts Surveillance and Confronts ROWE after He Purchases Firearms for WILLIAMSON SR. and WILLIAMSON II, Both Convicted Felons**

14.   On March 10, 2021, during the afternoon, ATF and Las Vegas Metro PD established surveillance positions in the area of Fallout and the residence listed as ROWE's billing information on the aforementioned GrabAGun invoices on Autzen Stadium Way in Las Vegas.

a.    During this time, surveillance units saw a Cadillac CTS sedan bearing CA license plate 7TTS094 parked in the driveway of ROWE's address.  A short time later, surveillance units saw the Cadillac CTS leave the area and head toward Fallout with ROWE in the front passenger seat of the Cadillac.

b.    A short time later, surveillance units saw the Cadillac CTS park in the parking lot near Fallout.  Surveillance units saw the driver of the vehicle, later identified as Maurice WILLIAMSON SR., operating a cellular phone.  ROWE then exited the front passenger seat and walked into Fallout.

c.    Surveillance units inside of Fallout saw ROWE operating a cellular device.  A short time later, surveillance units saw WILLIAMSON SR. enter Fallout.  As ROWE was waiting to be assisted by staff at Fallout, surveillance units inside of Fallout saw WILLIAMSON SR. direct ROWE's attention to the screen of his cellular device.  Moments later, surveillance units saw WILLIAMSON SR. walk out and back into Fallout periodically operating a cellular device.

d.    A short time later, surveillance units saw ROWE complete the firearms transaction.  ROWE certified his Form 4473 and took possession of two large boxes containing multiple firearms.  ROWE proceeded to pick up one of the boxes and walk out Fallout.  At or about this time, WILLIAMSON SR. walked into Fallout and picked up the second box.  WILLIAMSON SR. then walked out Fallout.

15.  At this point, ATF personnel blocked WILLIAMSON SR.'s vehicle, conducted a firearms interdiction, and detained both WILLIAMSON SR. and ROWE for further investigation into the potential federal firearm offenses.

16.  As agents and officers contacted WILLIAMSON SR., WILLIAMSON SR. made spontaneous statements regarding being a convicted felon.  Further, WILLIAMSON SR. provided law enforcement a California driver's license.  Law enforcement conducted a database query of WILLIAMSON SR.'s criminal history and learned that WILLIAMSON SR. sustained the following felony convictions:

a.  1993 - Felon in Possession of a Firearm in Riverside, CA (Court Case No. CR48915)

b.  1991 – Assault with a Deadly Weapon in Riverside, CA (Court Case No. CA033013J)

17.  I then conducted a preliminary non-custodial interview with ROWE.  When asked if he purchased the firearms for anyone else, ROWE claimed they were for him.  I asked ROWE if WILLIAMSON SR. had been to prison, to which ROWE responded that he had.  I asked ROWE about his employment to determine how he could pay for $27,820.45 in firearms.  ROWE stated that he was recently fired from a management position at McDonald's. Further, ROWE stated that various females pay him for relationships.  I then explained ATF would be seizing the firearms as evidence pending further investigation.

18.  According to the ATF Form 4473 that ROWE certified on March 10, 2021, ROWE purchased the twenty-nine firearms from the

11

online retailer GrabAGun, which were transferred by Fallout. Law enforcement seized the following 29 pistols from ROWE and WILLIAMSON SR. on March 10, 2021[1]:

     a.   five (5) Taurus, G3, 9mm semi-automatic pistols (bearing serial numbers ACA408135, ACA445606, ALA438696, ABN360164, and ACA466294);

     b.   two (2) SDS Tisas Zigana PX-9, 9mm semi-automatic pistols (bearing serial numbers 20BM16200 and 20BM16202);

     c.   three (3) Taurus, G2C, 9mm semi-automatic pistols (bearing serial numbers ACA392184, ACA406376, and ACA405830);

     d.   two (2) FN Herstal, Five Seven, 5.7 x 28mm semi-automatic pistols (bearing serial numbers 386399390 and 386399394);

     e.   one (1) Sarsilmar, SAR 9, 9mm semi-automatic pistol (bearing serial number 20BV87278);

     f.   one (1) Canik, CA1, 9mm semi-automatic pistol (bearing serial number 21BC05193);

     g.   one (1) Smith & Wesson, M&P, 40SW semi-automatic pistol (bearing serial number NJP7253);

     h.   one (1) FN Herstal, 509 Tactical, 9mm semi-automatic pistol (bearing serial number GKS0164275);

     i.   one (1) Springfield Armory, Hellcat, 9mm semi-automatic pistol (bearing serial number BA104170);

---

[1] An ATF interstate nexus expert confirmed that all the firearms below are manufactured outside the State of Nevada, and, indeed, they include a sampling of brands that manufacture their firearms in numerous states and countries.

       j.   one (1) Springfield Armory, XD-9, 9mm semi-automatic pistol (bearing serial number BA164640);

       k.   one (1) Glock, 43X, 9mm semi-automatic pistol (bearing serial number BPEM714)

       l.   one (1) Glock, 17 Gen 5, 9mm semi-automatic pistol (bearing serial number BPDK374);

       m.   one (1) Glock, 45, 9mm semi-automatic pistol (bearing serial number BRTN163);

       n.   one (1) Glock, 26 Gen 3, 9mm semi-automatic pistol; (bearing serial number BSMC602);

       o.   two (2) Glock 19 Gen 5, 9mm semi-automatic pistols (bearing serial numbers BSCU136 and BPDX716); and

       p.   five (5) Glock 19 Gen 3, 9mm semi-automatic pistols bearing (bearing serial numbers AFDK589, BPEX257, BSCB036, BSCB172, and AFDK390).

19.  Employees at Fallout informed agents and officers of a shipment of four additional firearms that arrived at Fallout a short time after ROWE and WILLIAMSON SR. were contacted by law enforcement, which were later seized.  Additionally, a total of seven firearms, paid for by ROWE, were later shipped to Fallout and another local FFL in the Las Vegas area, which were later seized by law enforcement days after ROWE and WILLIAMSON SR. were contacted on March 10, 2021.

**C.   Cell Phone Searches Confirm That ROWE Purchased Firearms for WILLIAMSON SR. and WILLIAMSON II**

20.  On March 10, 2021, ROWE had in his possession an Apple iPhone 12 cellular phone, for which investigators obtained a

search warrant authorized by United States Magistrate Judge
Weksler in the District of Nevada under Case No. 2:21-mj-232-
BNW.

21.  On March 15, 2021, I reviewed forensic extraction
reports of ROWE's Apple iPhone 12 cellular phone.  The forensic
extraction report contained multiple text messages between ROWE
and cellular phone number (951) XXX-6344, saved under the
contact name "Reece."

22.  On or about March 15, 2021, I reviewed forensic
extraction reports of SIM Card that located inside of the
Samsung Galaxy S9 cellular phone that was recovered from
WILLIAMSON SR., pursuant to a federal search warrant authorized
by United States Magistrate Judge Weksler in the District of
Nevada under Case No. 2:21-mj-233-BNW.  According to the
aforementioned forensic extraction, the cellular phone number
associated with the WILLIAMSON SR.'s SIM card is (951) XXX-6344.
This cellular phone number was saved under the contact name
"Reece" in ROWE's cellular phone.

23.  The following are text messages between ROWE and
cellular phone number (951) XXX-6344, saved under the contact
name "Reece" (WILLIAMSON SR.):

     a.   "Reece" texting ROWE on January 20, 2021:
"Grabagun.com He Said make an account"

     b.   "Reece" texting ROWE on January 20, 2021: "Hit
them 3 bars at top left and go all the way to bottom to create
an account"

c.   "Reece" texting ROWE on January 20, 2021: "If you make the acct I want the one at top left 3 of them"

d.   Photo sent from "Reece" to ROWE:



e.   ROWE texting "Reece" on January 21, 2021: "Dem outta stock"

f.   "Reece" texting ROWE on January 21, 2021: "ok"

g.   "Reece" texting ROWE on January 21, 2021: "what abt the one for 389"

h.   "Reece" texting ROWE on January 21, 2021: "sar usa cm9 9mm 17 rounds 339 try that one please"

i.   "Reece" texting ROWE on January 21, 2021: "not in stock disregard"

j.   "Reece" texting ROWE on January 21, 2021: "I'll be looking"

k.   Photo sent from "Reece" to ROWE on January 21, 2021:



l.   "Reece" texting ROWE on January 21, 2021: 6 additional images of various pistols from what appears to be from www.grabagun.com

m.   "Reece" texting ROWE on January 21, 2021: "I want 2 of them then Ill come back and get the other 3"

n.   "Reece" texting ROWE on January 21, 2021: image of SAR USA Sar9 9mm Pistol, from what appears to be from www.grabagun.com

o.   "Reece" texting ROWE on January 22, 2021: "this is where you pick it up at"

p.   "Reece" texting ROWE on January 23, 2021: "sending 777 now ffl locator picked the one on craig"

q.   "Reece" texting ROWE on January 23, 2021: "I need the 2 for 389"

r.   ROWE texting "Reece" on January 23, 2021: "Dem outta stock too now"

s.   "Reece" texting ROWE on January 23, 2021: "Can you make the acct so you'll already be approved"

t.   "Reece" texting ROWE on January 23, 2021: "PX-9 9mm 4 18 Round Black SDS Imports ZPX918RD2 https://grabagun.com/new-arrivals/sds-imports-px-9-9mm-4-barrel-18-rounds.html"

u.   Photo sent from ROWE to "Reese" on January 23, 2021:





v.   "Reece" texting ROWE on January 28, 2021: "Do you know what time this place close so we can go there today and get your back ground check done ..."

w.   "Reece" texting ROWE on January 28, 2021: "I have to go back to cali asap"

x.   ROWE texting "Reece" on January 28, 2021: "Dey called me at like 4 yesterday so Dey should be open till at least 5 or sum"

y.   "Reece" texting ROWE on January 28, 2021: "Ok ..we got to pay for the background ill slide the dough to you"

z.   ROWE texting "Reece" on January 28, 2021: "fs"

aa.  "Reece" texting ROWE on January 28, 2021: "You ready to go"

bb.  ROWE texting "Reece" on January 28, 2021: "fs"

cc.  Between January 28, 2021 and March 3, 2021, "Reece" and ROWE exchanged numerous text messages, some which included what appeared to be facilitating firearm transactions with the online retailer GrabAGun.

24.  I reviewed the following transactions from ROWE's "Cash App" application on ROWES's cellular phone pursuant to the aforementioned federal search warrants.  As described in further detail below, a comparison of firearm transactions made by ROWE and deposits made to ROWE's Cash App reveals similar dollar amounts and dates of the deposits made from username "Williamson" (User ID: $legendaryes1) and username "Maurice Williamson" (User ID: $lilreece12).

a.   The following payments were made to ROWE's Cash App from the Cash App username "Williamson" and user ID "$legendaryes1:"

March 2 + $10

March 2 + $20

Feb 18 + $725

Feb 7 + $150

Jan 28 + $20

Jan 23 + $441

b.   The following payments were made to ROWE's Cash App from the Cash App username "Maurice Williamson" and user ID "$lilreece12:"

March 2 + $30

February 18 +$1,645 with a note stating "that order"

25.  I queried WILLIAMSON SR. via the social media platform Facebook.  The query resulted in the public Facebook profile for Maurice WILLIAMSON II (User ID: lilreece12).  A further search of the profile resulted in other Facebook users commenting on WILLIAMSON II's birthday on July 21.  A search of CA DMV records and criminal history records resulted in a Maurice WILLIAMSON II, born July 21, 1990.  I compared the California DMV image of WILLIAMSON II captured February 5, 2019, to the Cash App profile picture of the username "Maurice Williamson" and user ID "$lilreece12" and determined it to be the same individual.  I reviewed WILLIAMSON II's criminal history and learned that had been convicted of the following felony convictions in

California: participation in a criminal street gang; burglary; and assault with a firearm on a person.

26.   Further, the forensic extraction report of ROWE's cellular phone contained multiple text messages between ROWE and cellular phone number (951) 941-0309, saved under the contact name "ManMan."  I queried the cellular phone number (951) 941-0309 utilizing the Cash App request payment feature.  The query resulted in the Cash App username "Maurice Williamson" and user ID "$lilreece12," as described above, being associated with the aforementioned phone number.  It should also be noted that January 24, 2021, was ROWE's 21st birthday, which is the legal age to purchase handguns from an FFL.  Further, ROWE purchased a firearm on January 24, 2021, from the online retailer GrabAGun which was later transferred to him January 28, 2021.  The following are text messages between ROWE and "ManMan" (WILLIAMSON II) on January 24, 2021, where WILLIAMSON II discusses straw purchases with ROWE and also references straw purchases ROWE conducted with WILLIAMSON SR.

a.   "ManMan" Texting ROWE on January 24, 2021: First off happy c day my young bull..2nd let's do these orders right my dad is an idiot.

b.   ROWE texting "ManMan" on January 24, 2021: Glooks. And bet. Jus. Lmk u gone be out here. Dey had hella out of stock.

c.   "ManMan" texting ROWE on January 24, 2021: Imma show u something hold on..imma order first then u gotta go get

em from the store they gonna run a baccgound check all u need is
yo id

        d.    "ManMan" texting ROWE on January 24, 2021:
Defender XD Service 9mm 4 16 Round Black Springfield Armory
XDD9101HC https://grabagun.com/springfield-armory-defender-xd-
9mm-black-4-16-1.html

        e.    "ManMan" texting ROWE on January 24, 2021: CPX-2
RD 9mm 3.1 10 Round Gray / Black SCCY CPX-2CBSGRD
https://grabagun.com/sccy-cpx-2-rd-gray-black-9mm-3-1-barrel-10-
rounds-cts-1500-reflex-sight.html

        f.    "ManMan" texting ROWE on January 24, 2021: Girsan
Regard MC 9mm 4.9 18 Round Black EAA Corp 390080
https://grabagun.com/eaa-girsan-regard-92-9mm-19rd-blk.html

        g.    ROWE texting "ManMan" on January 24, 2021: Fs
when?

        h.    "ManMan" texting ROWE on January 24, 2021: Imma
put it together

        i.    ROWE texting "ManMan" on January 24, 2021: Bet
lmk when u want me to go up there

        j.    "ManMan" texting ROWE on January 24, 2021: U jus
order online

        k.    "ManMan" texting ROWE on January 24, 2021: U dint
go anywhere

        l.    ROWE texting "ManMan" on January 24, 2021: Don't
I go up there for the background doe

        m.    "ManMan" texting ROWE on January 24, 2021: Yea
once they come

n.   ROWE texting "ManMan" on January 24, 2021: Bet

o.   "ManMan" texting ROWE on January 24, 2021: Call me

p.   ROWE texting "ManMan" on January 24, 2021: Fs ima tap n when I get off wit tada

27.   I reviewed forensic extraction reports of ROWE's Apple iPhone 12 cellular phone.  The forensic extraction report contained multiple Instagram direct messages between Instagram profiles "acerowe21" and "Lil Reece."  I reviewed the public Instagram profile of "acerowe21" and saw numerous images of ROWE with multiple images captioned in the first person, indicating that the account is operated by ROWE.  Further, I reviewed the public Instagram profile "Lil Reece" and determined that the account is likely operated by WILLIAMSON II.  Before ROWE was contacted by law enforcement at Fallout on March 10, 2021, "acerowe21" and "Lil Reece" (WILLIAMSON II) exchanged the following Instagram direct messages.

a.   FROM "acerowe21" on March 9, 2021: He Talkin bout da baccgroun aint came back dey been callin can't get n da que

b.   TO "acerowe21" on March 9, 2021: They need to keep callin..the guy said it take like 4 hours

c.   FROM "acerowe21" on March 9, 2021: Fax doe. Dey c all do orders it's too much money put in dis Shi for dem to be takin dis long

d.   TO "acerowe21" on March 9, 2021: Facts

e.   TO "acerowe21" on March 10, 2021: Tops

f.   FROM "acerowe21" on March 10, 2021: Tops. Da other ppl hit me today said I can go Saturday to do do Shi

g.   TO "acerowe21" on March 10, 2021: Saturday?

h.   TO "acerowe21" on March 10, 2021: Nigga it's Wednesday

i.   FROM "acerowe21" on March 10, 2021 at 1:51 p.m.: Dey still waiting for sum

j.   TO "acerowe21" on March 10, 2021 at 1:59 p.m.: Nah transfer wat u can bro

k.   TO "acerowe21" on March 10, 2021 at 2:18 p.m.: He said he gone take u

l.   TO "acerowe21" on March 10, 2021 at 2:22 p.m.: U got 4 more landing today and 1 tomorrow and then they r done for good

m.   FROM "acerowe21" on March 10, 2021 at 2:26 p.m.: Fs all at da other spot

n.   TO "acerowe21" on March 10, 2021 at 2:22 p.m.: At fallout

o.   TO "acerowe21" on March 10, 2021 at 2:34 p.m.: (AUDIO MESSAGE) "and you waiting for two more at the other spot"

p.   TO "acerowe21" on March 10, 2021 at 2:37 p.m.: They cancelled the cZ

q.   TO "acerowe21" on March 10, 2021 at 2:37 p.m.: 78455149400

r.   TO "acerowe21" on March 10, 2021 at 2:37 p.m. to 2:40 p.m.: (UNKNOWN VIDEO CHAT CALL)

23

      s.   TO "acerowe21" on March 10, 2021 at 2:43 p.m:
(Link to a youtube video of a CZ Scorpian Evo 3 Machiengun)

### D.   Surveillance at WILLIAMSON II's Home in Riverside, California

28.  On March 17, 2021, SA Paul Kirwan from the ATF Riverside Field Office learned about the investigation into ROWE, WILLIAMSON SR., and WILLIAMSON II.  As a result, SA Kirwan queried law enforcement databases and learned that WILLIAMSON II is a multiple convicted felon and known 1200 Blocc Crypt gang member primarily located in the City of Riverside.  As a result, SA Kirwan reached out to Riverside Police Department Gang Detectives and inquired about WILLIAMSON II.  RPD Detective Childress advised that they were familiar with WILLIAMSON and that he was recently under investigation in one of their cases.  Detective Childress advised that WILLIAMSON II is known to live at the SUBJECT PREMISES.  This address was known because RPD acquired WILLIAMSON II's Facebook messages pursuant to a state search warrant for WILLIAMSON II's Facebook account, the same Facebook account that I discussed above.  WILLIAMSON II on multiple occasions advised others on Facebook of his current address.

      a.   On 01/26/21, MrsMika Carpenter and Maurice Williamson have the following exchange:

Author: MrsMika Carpenter (Facebook: 100004231291648)

Sent: 2021-01-26 15:33:35 UTC

Body: 807 W. Blaine st. #215

Riverside Ca. 92507

Author: MrsMika Carpenter (Facebook: 100004231291648)

Sent: 2021-01-26 15:33:42 UTC

Body: Confirming


Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-26 17:13:03 UTC

Body: Yes

      b.   On 01/15/21, Dominic Washingon and Maurice Williamson continue their conversation:

Author: Dominic Washington (Facebook: 100001249188878)

Sent: 2021-01-15 21:49:12 UTC

Body: I'm here


Author: Dominic Washington (Facebook: 100001249188878)

Sent: 2021-01-15 21:49:20 UTC

Body: On Blayne


Author: Dominic Washington (Facebook: 100001249188878)

Sent: 2021-01-15 21:49:27 UTC

Body: Where exactly


Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-15 21:49:33 UTC

Body: Pull in the car wash


Author; Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-15 21:49:37 UTC

Body; I'm behind there[2]


Author: Dominic Washington (Facebook: 100001249188878)

Sent: 2021-01-15 21:49:58 UTC

Body: Aight there in 2 min


Author: Dominic Washington (Facebook: 100001249188878)

Sent: 2021-01-15 21:53:51 UTC

Body: I'm here


Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-15 21:54:41 UTC

Body: Come to the bacc im comin down

     c.   On 01/24/21, Marc Cole and Maurice Williamson have the following exchange while WILLIAMSON orders beard oil:

Author: Marc Cole (Facebook: 100008303344960)

Sent: 2021-01-24 06:33:42 UTC

Body: U Tryna get some beard oil or wat? Acting like you been waiting on me lol


Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-24 06:34:12 UTC

Body: I have

---

[2] According to SA Kirwan's observations, the only carwash on Blaine Street in that area is located adjacent to the 807 W. Blaine Street apartment complex.

Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-24 06:34:26 UTC

Body: Well maybe Mika but I picced the peach one

Author: Marc Cole (Facebook: 100008303344960)

Sent: 2021-01-24 06:35:52 UTC

Body: You want a peach one? I got u cuz send the address

Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-24 06:41:11 UTC

Body: 807 west blaine street 215

Riverside CA 92507

29.   RPD Gang Detectives also advised that WILLIAMSON II
was affiliated with two vehicles.  SA Kirwan queried law
enforcement databases and learned that, on or about November 25,
2020, someone reported the SUBJECT HONDA stolen, but the vehicle
was recovered.  WILLIAMSON II is listed in law enforcement
databases as the registered owner of the SUBJECT HONDA, but the
vehicle's status is pending master file record in DMV records.
SA Kirwan spoke with RPD detectives familiar with California DMV
records.  Those detectives informed him that the "pending master
file" designation commonly occurs when a record of sale has been
filed with the DMV indicating that a car was sold to a buyer but
the buyer has not complied with some DMV requirement (e.g.,
paying registration fees or completing a smog check) to register
the car in the buyer's name with the DMV.  Additionally,

Facebook messages also acquired from WILLIAMSON II's Facebook account reveal that he is affiliated with the SUBJECT MERCEDES.

     a.   On 01/15/21, Maurice Williamson is having the following exchange regarding the towing of a Mercedes Benz:

Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-15 01:09:40 UTC

Body; Oh I jus wanna kno a price at this point cuz fucc this benz

Author: Breauhna Williams-Myricks (Facebook: 100001384542359)

Sent: 2021-01-15 01:10:08 UTC

Body: Wats wrong with it now

Author: Breauhna Williams-Myricks (Facebook: 100001384542359)

Sent: 2021-01-15 01:10:30 UTC

Body: N ok lmk the price

Author: Maurice Williamson (Facebook: 100002159833607)

Sent: 2021-01-15 01:22:39 UTC

Body: My uncle said between 250 and 350 but it had to be towed

30.  On March 24, 2021, SA Kirwan and Detective Childress conducted surveillance at the SUBJECT PREMISES.  They saw the SUBJECT HONDA parked directly across from apartment #215.  At the front door of apartment #215 was a package addressed to "Joy Tutt" at that address.  A short time later, the SUBJECT MERCEDES

pulled into the parking lot and parked near the SUBJECT HONDA directly across from the apartment.  A woman that they identified as Joy Tutt from DMV photographs, along with two children, exited the SUBJECT MERCEDES and walked towards the SUBJECT PREMISES.

31.  Based on the information provided from RPD, Facebook Messages, surveillance observations and my training and experience I believe WILLIAMSON II lives at the SUBJECT PREMISES and drives the SUBJECT HONDA and SUBJECT MERCEDES.  Although WILLIAMSON II is not the registered owner of the SUBJECT MERCEDES, based on my training and experience, it is common for individuals engaged in criminal activity to not register things like vehicles in their name in order to avoid detection by law enforcement.  And, as explained further below, firearm traffickers often keep evidence of their trafficking in the vehicles they use.

**E.   Phone Pings for WILLIAMSON II's Phone**

32.  On March 30, 2021, I obtained a warrant from United States Magistrate Judge Cam Ferenbach, in District of Nevada case number 2:21-mj-00285-vcf, for GPS location data from (951) 941-0309, the cellular phone number associated with WILLIAMSON II in ROWE's phone discussed above.  I began receiving GPS location data pursuant the warrant that same day.

33.  The data showed that, between March 30 and April 2, 2021, the cellular phone was pinging repeatedly every night within about 60 meters and 300 meters of the SUBJECT PREMISES during the late evening and morning hours.  In my training and

experience, that ping pattern is consistent with someone living at a particular property.

**F.   Training and Experience on Firearm Offenses**

34.  Based upon my training, experience, and consultation with other law enforcement officers, I have learned the following:

a.   that firearms are items of value that are not perishable and not often discarded.  Additionally, those involved in criminal activity routinely keep firearms to protect themselves, their co-conspirators, and proceeds from criminal activity, anyone who may wish to rob them of those items.

b.   that persons who possess and purchase firearms and ammunition will generally keep them for an extended period and maintain a supply on hand for immediate use.  The firearms are commonly kept on their person and in locations associated with the criminal, including in the home or in the vehicles of, or used by, the individual.

c.   that individuals engaged in criminal activity will often hide their supply of firearms and in garages, outbuildings, storage areas, and/or sheds associated with or near their residence, or in yard areas surrounding such premises, by burying the firearms or otherwise attempting to conceal them.

d.   that persons who traffic firearms commonly keep within their residences and/or vehicles items of indicia which tend to show the identity of the person or persons in control of the premises or vehicles such as utility bills, lease

30

agreements, rent receipts, canceled mail envelopes and cards, telephone bills, canceled checks, bank statements, savings account passbooks, deposit receipts, passports, diaries, social security cards, drivers licenses, vehicle registration and title papers, land titles, escrow papers, tax receipts, identification cards, photographs and keys.

       e.    that prohibited individuals who engage in unlicensed firearms trafficking often obtain these firearms through illegal means.  I know that one way to acquire firearms is for the trafficker to use another person to "straw purchase" the firearms or acquire them through private sales.  The "straw purchase" method usually utilizes a friend or relative, who is a resident of the firearm source state, to purchase the firearm for the intended trafficker or possessor.  Once the firearm is purchased, it can be smuggled into a more restrictive market states, such as California, for sale.  The straw purchaser may conduct the purchase as a favor or for monetary gain.

       f.    that trafficked firearms from other states are likely to be shipped in boxes, containers, or parcels, to which shipping labels, bills of lading, confirmation numbers and/or tracking numbers may be affixed.  I also know that "brand new" firearms will be transferred in their original box, which may contain additional items associated with the firearm, such as an owner's manual or safety lock.  This evidence may not be readily exposed of as they may appear innocuous at first glance but have significant relevance when considered in light of other evidence.  These items can be found months and often years after

the firearm's initial acquisition because traffickers often do not include the box or other associated items when illegally selling the firearm.

g.    that individuals involved in firearms trafficking frequently possess firearms, ammunition, magazines, holsters, silencers, and other firearms related items, or explosives, incendiary devices, and other dangerous weapons, to protect their profits, supply of firearms, and persons from others who might attempt to forcibly take such items and/or harm them during transactions.  Such weapons, which are oftentimes stolen or otherwise possessed illegally, are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

h.    that convicted felons, illegal aliens and gang members will enlist friends' and family members with little or no criminal history to purchase, sell, possess, or acquire firearms on their behalf.  Due to federal firearms laws, convicted felons and illegal aliens are classified as "prohibited persons" and are unable to legally purchase or possess firearms.  It is common for convicted felons, illegal aliens, and gang members to attempt to avoid arrest and prosecution of federal firearms laws by using "clean" people who have little or no criminal history to obtain these firearms.

i.    that the sort of illegal activities described above are often arranged through communication devices such as cell phones.  I know that people who negotiate the illegal sale

32

of firearms in the manner described above will often use cell phones to contact their sources of supply to obtain additional quantities of firearms.  Similarly, traffickers will use cell phones to contact their customers to facilitate firearms transactions, specifically to discuss quantity and price, and arrange meeting locations.  Additionally, I believe that it is reasonable to think WILLIAMSON would have communicated, presumably through cell phones, to arrange for the transfer and storage of firearms at the SUBJECT PREMISES.  Further, based on my training and experience, I know that people who negotiate the illegal sales of firearms in the manner described above will often have their records of telephone calls, text messages, SMS messages, and voicemails stored within the device and with the electronic communications storage for the cellular telephone service provider.  I know that cellular telephones are often programmed for speed dialing, contain contact lists, and recent call activity.

        j.   that persons involved in criminal activity who sell firearms, and those who aid and abet their activities, frequently take, or cause to be taken, photographs and/or videos that provide evidence of their criminal conduct, such as images/videos depicting their association with conspirators; their firearms and associated items, such as firearm accessories, the location of their residences, vehicles, stash houses, or other firearm storage locations.

        k.   that firearms traffickers often maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other

forms of records specifically relating to their firearm distribution activities, in order to account for the transportation, ordering, purchase and distribution of firearms and the remittance of its proceeds.  In this case, WILLIAMSON II is believed to have arranged to purchase multiple firearms.  As a result, he may have "fronted" (that is, sold on consignment) firearms to his clients and such documentation is necessary to keep track of the amounts paid and owed with respect to his customers and their suppliers.  These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.  Such records, which may be encoded to protect those involved in the distribution activities, will often be maintained by firearms traffickers on their persons or in their residences.  This evidence may not be readily exposed of as they may appear innocuous at first glance but have significant relevance when considered in light of other evidence.  These items can be found months and often years after their initial acquisition.

35.  that a firearm is a complicated machine.  It has precise moving parts that need to be maintained, cleaned, and repaired and replaced from time to time using maintenance items. I know that possessors of firearms generally keep such firearms-related items in their homes, along with the firearms and ammunition themselves.  This ensures that the items are available when they are needed.  Accordingly, I know that possessors of firearms generally keep such indicia of firearms

34

possession, such as ammunition magazines, machine oil/lubricant, cleaning kits, targets (used and new), manuals, and  spare gun parts such as springs, barrels, and receivers in their homes or in the vehicles they use.

36.  that gun owners often take photographs and videos of themselves while armed and/or while posing with firearms.  Such "trophy shots" are often kept as mementos or novelties, and are often shared with friends, sometimes via electronic mail.  In addition, with the increasingly common use of digital cameras, including cellular telephones with built-in cameras, trophy shots are often maintained in digital form on computers or in the memories of digital devices, such as cellular telephones or personal data accessories.

37.  that firearms traffickers often use vehicles to transport firearms and firearms related items to and from the traffickers' residences.  The traffickers use their vehicles, as well as the vehicles of their friends and associates, for such transportation, and they will often leave evidence of their trafficking, such as a receipt of purchase, inside the vehicle unwittingly.

38.  that firearms traffickers use devices to conduct counter surveillance against law enforcement, such as two-way radios, police scanners, video surveillance systems, anti-bugging devices, police radios, surveillance cameras, monitors and recording devices.

39.  that persons involved in criminal activity are often connected to one or more coconspirator and/or suppliers and

often hide or keep things for others engaged in criminal activity in their residences, businesses, vehicles, or storage units.

## V.   CONCLUSION

40.  For all the reasons above, there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found at the places described in Attachments A-1 through A-4.

Attested to by the applicant, ATF
SA Brandon May, in accordance with
the requirements of Fed. R. Crim.
P. 4.1 by telephone on this  2nd
day of  April    , 2021.


_____
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A-2</u>**

<u>Description of Person to be Searched</u>

  Maurice Landon WILLIAMSON II, born July 21, 1990, a black male adult, approximately 6ft tall, 200 lbs, with CA DL No. E2981543.



## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are fruits, contraband, evidence, or instrumentalities of 18 U.S.C. § 371, Conspiracy to Commit an Offense Against the United States; 18 U.S.C. § 922(a)(6), False Statement During Attempted Acquisition of a Firearm; 18 U.S.C. § 922 (d)(1), Disposing of a Firearm to a Convicted Felon; 18 U.S.C. § 922 (g)(1), Felon in Possession of Firearm(s) and/or Ammunition (collectively, the "Subject Offenses"), namely:

        a.    Firearms, ammunition, and firearm parts;

        b.    Tools or equipment commonly used to manufacture/modify firearms, including rotary tools, jig pieces, drills, drill presses, drill bits, vices, and gun blue;

        c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

        d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

   i. Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of firearms, or ammunition;

   j. Contents of any calendar or date book;

   k. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations from August 1, 2020, to the present; and

   l. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

   m. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## I.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means          ☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>the person of Maurice WILLIAMSON II, born July 21, 1990 | )<br>)<br>)<br>)  Case No.   5:21-MJ-00234<br>)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      <u>April 2, 2021 at 5:30 p.m.</u>      _____

*Judge's signature*

City and state:      <u>Riverside, California</u>      _____

Hon. Sheri Pym
*Printed name and title*

AUSA: J. Balla (951-276-6246)  /s/

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A-2</u>

<u>Description of Person to be Searched</u>

    Maurice Landon WILLIAMSON II, born July 21, 1990, a black male adult, approximately 6ft tall, 200 lbs, with CA DL No. E2981543.



## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are fruits, contraband, evidence, or instrumentalities of 18 U.S.C. § 371, Conspiracy to Commit an Offense Against the United States; 18 U.S.C. § 922(a)(6), False Statement During Attempted Acquisition of a Firearm; 18 U.S.C. § 922 (d)(1), Disposing of a Firearm to a Convicted Felon; 18 U.S.C. § 922 (g)(1), Felon in Possession of Firearm(s) and/or Ammunition (collectively, the "Subject Offenses"), namely:

a.    Firearms, ammunition, and firearm parts;

b.    Tools or equipment commonly used to manufacture/modify firearms, including rotary tools, jig pieces, drills, drill presses, drill bits, vices, and gun blue;

c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   e. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   f. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   g. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

   h. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

    i.   Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of firearms, or ammunition;

    j.   Contents of any calendar or date book;

    k.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations from August 1, 2020, to the present; and

    l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

    m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iii

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## I.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

vii

outside the scope of the items to be seized absent further order of the Court.

     5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

     a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

     b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

     c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

     d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

     e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

     f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

     g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

     6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.